**No. 51373.**—Petition 6533–R of Buchman Manufacturing Co., Inc. (Pittsburgh).

COLE, Judge: The provisions of section 489, Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1489), are invoked in this case to obtain the remission of additional duties accruing by reason of the final appraised values exceeding the entered values of duck feathers imported from Hong Kong, China, and entered for consumption at Pittsburgh, Pa.

Samuel Buchman, president of the petitioner corporation, testified concerning the purchase of the instant merchandise and the circumstances leading to its entry for customs purposes. A summary of his testimony follows.

The merchandise was bought in June 1941, under written contracts (collective exhibit 1) at 42 cents per pound, c. i. f. New York. At the time of purchase, petitioner believed the transaction to be an outright purchase from a domestic concern, Arnhold & Co., Inc., 80 Broad Street, New York City, with whom the contracts were negotiated. If it had been known at that time that petitioner had assumed the obligations of an importer, it (petitioner) "would have opened a letter of credit with foreign bankers and not gone to domestic bankers for the letter of credit" (R. 23). Credit was established with the First National Bank at Pittsburgh (letter of credit No. 4666, exhibit 2). The goods arrived in New York on January 2, 1942, and were shipped by the said Arnhold & Co., Inc., under an "Inland Transportation Entry." Payment for the merchandise was made under the letter of credit, exhibit 2, *supra*, upon surrender of a domestic bill of lading and the consular invoices.

At the time of arrival of the merchandise, petitioner was organizing and equipping in Philadelphia a new plant for war work, which made it necessary for the said Samuel Buchman to move from Pittsburgh, where he had lived for 20 years, and settle in Philadelphia. It was also during this period, when he was actively engaged in the construction of a war plant, that he received for signature the entry which had been prepared by the customs broker in Pittsburgh. Up to then, none of the petitioner's records had been moved from its plant in Carnegie, Pa., so the witness was without the benefit of the contracts, collective exhibit 1, *supra*, and the domestic invoices, collective exhibits 5 and 6, which were the only documents pertaining to the transaction under consideration that he ever received. The consular invoices were never sent to the witness, having been delivered by the bank direct to the customs broker, but when the entry was presented to him he knew that the figures set forth therein were based upon those shown in the consular invoices, and he "took for granted" they were the same as what the domestic commercial invoices showed. Accordingly, he signed the entry without making any changes and returned it to the customs broker in Pittsburgh, where it was filed, showing values equivalent to the prices set forth on the consular invoices, i. e., 39½ cents per pound and 41½ cents per pound, which the appraiser advanced to 45 cents per pound, less certain nondutiable charges.

A letter from the collector of customs at Pittsburgh, dated March 14, 1944 (exhibit 3), directed petitioner's attention to "the difference in values between those stated in the consular invoices submitted with the entry and the commercial invoices and contracts," and advised that in view of such discrepancies "the merchandise or the domestic value thereof amounting to $10,292.22 is subject to forfeiture under section 592, Tariff Act of 1930." (It can be added at this point that the penalty was ultimately mitigated to $100 after the Commissioner of Customs had found "that the violations did not involve any fraudulent intent," exhibit 7.) Mr. Buchman testified that petitioner did not know it was named as the importer of the instant merchandise until "about three months

after receipt of this letter," exhibit 3, *supra*, which was around the middle of 1944 and when "we discussed this matter with the Philadelphia Customs Collector."

The obligation of handling the present shipment as an importation did not introduce a new procedure for petitioner, as disclosed by the following excerpt from the witness' testimony:

Q. In January, 1942, you had only been living in Philadelphia for a few months, and prior to that time you resided in Pittsburgh. Did you handle customs matters in your company in prior years, while you were in Pittsburgh?—A. Yes, sir.

Q. What knowledge did you have of the way in which these customs matters and the entry of values and the granting of refunds or the collection of greater duties were handled in the customs office in Pittsburgh?—A. The procedure for the twenty years we had been importing had been as follows: the consular invoice would be turned over to our broker who would then appear at the appraiser's office, and if the appraiser had the market value at that time of the shipment he would enter the value given by the appraiser.

Q. Mr. Swearer would?—A. That's right. If the appraiser did not have any value he would permit Mr. Swearer to make entry in accordance with our consular invoice and when the true value came through he would then permit an amendment to the entry, either increasing or decreasing the value and the duty proportionately.

Petitioner assumed the same procedure would be followed in the present case, so no information was furnished to the customs broker, expecting him to obtain all necessary data from the appraiser, yet the witness admitted that he never showed the contracts, said collective exhibit 1, to any customs official.

R. L. Swearer, the customs broker, corroborated the testimony of the previous witness, so far as it related to the procedure followed by petitioner in entering merchandise, and stated further that prior to filing the entry in question he showed the consular invoices to the appraiser who had no other value to suggest so entry was made accordingly. In the present instance, however, the appraiser departed from the recognized practice of permitting amendment upon finding a higher value, and went ahead to appraise the merchandise at the advanced value, so that the first thing the customs broker knew about this transaction was that "the Buchman Manufacturing Company was accused of undervaluation." Concerning his preparation of the consumption entry in question, the customs broker testified as follows:

Q. You filed the consumption entry?—A. Yes. I got the invoices out of the First National Bank at Mr. Buchman's request and then went ahead and filed the entry.

Q. Were the consular invoices the invoices you got from the First National Bank?—A. That's right.

Q. You prepared the consumption entry and sent it to Mr. Buchman for signature?—A. That's right.

Q. In Philadelphia?—A. Pittsburgh.

Q. Where was Mr. Buchman?—A. At Carnegie.

Q. Mr. Buchman, himself?—A. I would not remember that. We would send the entry to Carnegie for him to sign it. I wouldn't remember whether he was there or not.

Q. But it came back signed by Mr. Buchman. He was then in Philadelphia. Where did you get the value figures to put on the consumption entry?—A. From the consular invoices.

It will be observed from the foregoing quotation that the customs broker did not know of the previous witness being in Philadelphia prior to entry.

In further testimony, the customs broker also admitted that he had no knowledge of the existence of the contracts, collective exhibit 1, *supra*.

Petitioner's proof has been outlined in detail to set out certain phases thereof that cannot be reconciled with facts appearing from the entry, the official document, itself. It is consumption entry 297, bearing date of January 22, 1942, and shows very definitely that the shipment under consideration was imported by the

"Buchman Mfg. Co." on January 2, 1942, from Hong Kong, China. The document is signed by "Buchman Mfg. Co., Per S. Buchman, Carnegie, Pa." Furthermore, the "Declaration of Consignee or Agent," embodied in said entry, and attesting to the truthfulness and correctness of "all statements appearing in the entry and in the invoice or invoices and other documents presented herewith," was executed at Pittsburgh, Pa., on January 10, 1942, by "Buchman Mfg. Co., S. Buchman, Carnegie, Pa." Thus, we find positive documentary evidence that petitioner, with 20 years' experience as an importer, was fully apprised, in Pittsburgh, of its status as importer of the merchandise in question on January 10, 1942, more than 2 years before receipt of the letter, exhibit 3, supra. It is impossible to reconcile this clear discrepancy between the documentary proof and the testimony in the case. While petitioner was not asked by counsel to explain this conflict—in fact, no reference whatsoever is made to it in the testimony—the contradictions revealed from analysis of the said consumption entry along with the oral testimony are too strong for the court to ignore.

Section 489, supra, authorizes remission of additional duties upon production of "satisfactory evidence" that the entry of the merchandise was without any intention to defraud the revenue of the United States or to conceal or to misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise. On the record before us, petitioner has failed to meet its statutory burden.

The petition is therefore denied and judgment will be rendered accordingly.